Jason M. Ingber (SBN 318323)
Serach B. Shafa (SBN 358332)
**Ingber Law Group**
3580 Wilshire Blvd., Suite 1260
Los Angeles, California 90010
Telephone: (213) 805-8373
E-mail: ji@jasoningber.com

Attorneys for Plaintiffs
GIL ABRAHEM SWIGI and JOSEPH MIZRAHI

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| GIL ABRAHEM SWIGI and JOSEPH MIZRAHI, individually and on behalf of all others similarly situated, | CASE NO: |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **(1) VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, ET SEQ.)** |
| VINFAST AUTO, LLC, a Delaware limited liability company; and DOES 1 through 50, inclusive, | **(2) VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT (CAL. CIV. CODE § 1790 ET SEQ.)** |
| | **(3) BREACH OF EXPRESS WARRANTY** |
| Defendants. | **(4) BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY** |
| | **(5) VIOLATION OF CONSUMER LEGAL REMEDIES ACT (CLRA** |
| | **(6) FALSE ADVERTISING (CAL. BUS. & PROF. CODE § 17500)** |
| | **(7) BREACH OF CONTRACT** |
| | **(8) VIOLATION OF UNFAIR COMPETITION LAW (CAL. BUS. & PROF. Code § 17200)** |
| | **DEMAND FOR JURY TRIAL** |

1

**COMPLAINT**

Plaintiffs GIL ABRAHEM SWIGI and JOSEPH MIZRAHI ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, hereby file this Class Action Complaint against Defendant VINFAST AUTO, LLC ("VINFAST" or "Defendant"), and allege as follows:

## INTRODUCTION

1.    This is a consumer class action arising from Defendant VINFAST AUTO LLC's false advertising and failure to deliver electric vehicles ("EVs") as promised. The named Plaintiffs, Gil Abrahem Swigi and Joseph Mizrahi, each leased a 2024 VINFAST VF 8 PLUS AWD electric vehicle with the representation that the vehicles would charge at industry-standard speeds. Instead, Plaintiffs discovered post-purchase that the vehicles only charge at a dramatically reduced rate, requiring nearly 24 hours to fully charge, rendering the vehicles impractical for their intended use.

2.    Plaintiffs and similarly situated consumers were misled into leasing or purchasing these vehicles under materially false pretenses. Despite repeated attempts to have the issues repaired, the problems persist.

## PARTIES

3.    Plaintiff Gil Abrahem Swigi is a natural person and citizen of the State of California, residing in Los Angeles County. Mr. Swigi leased a 2024 Vinfast VF 8 Plus AWD with 87.7 kWh battery on or about August 8, 2024, for personal, family, or household purposes.

4.    Plaintiff Joseph Mizrahi is a natural person and citizen of the State of California, residing in Los Angeles County. Mr. Mizrahi leased a 2024 Vinfast VF 8 Plus AWD with 87.7 kWh battery on or about August 18, 2024, for personal, family, or household purposes.

5.    Defendant VINFAST AUTO, LLC is a Delaware limited liability company doing business in the State of California, including Los Angeles County. VINFAST is an automotive manufacturer that designs, develops, manufactures, markets, and sells

2
**COMPLAINT**

electric vehicles throughout the United States, including in California. VINFAST operates multiple dealerships and service centers in California and conducts substantial business activities in this state.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7.     This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in California, operates dealerships and service centers in California, advertises and markets its vehicles to California consumers, and has sufficient minimum contacts with California such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

8.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and Defendant conducts substantial business activities in this District.

## FACTUAL ALLEGATIONS

9.     On August 8, 2024, Plaintiff Swigi leased a 2024 VINFAST VF 8 PLUS AWD 87.7 KWH from Defendant. (Exhibit A – Swigi Lease Agreement).

10.     On August 18, 2024, Plaintiff Mizrahi leased the same vehicle model from Defendant. (Exhibit B – Mizrahi Lease Agreement).

11.     VINFAST represented through marketing materials and dealership staff that the vehicles charge rapidly consistent with Level 2 or higher EV charging capabilities (6.6kW or more).

12.     These charging representations were material to Plaintiffs' lease decisions as charging times determine an electric vehicle's daily usability.

**COMPLAINT**

13.     After taking possession, Plaintiffs discovered their vehicles charge at rates under 2 kW, requiring nearly 24 hours for full charges.

14.     Defendant advertises the vehicles to charge at industry-standard 32 amps, which enables reasonable charging times.

15.     However, according to Defendant, the vehicle has a software defect which causes the car to shut down and stop charging when users attempt to charge at the advertised 32-amp rate.

16.     To avoid the charging shutdown, users must manually lower the amperage to 19 amps or below - reducing charging power by nearly 40%.

17.     This amperage reduction from 32 amps to 19 amps roughly doubles the charging time, resulting in nearly 24 hours for a full charge.

18.     At the reduced 19-amp rate, Plaintiff Mizrahi's vehicle requires 7 hours to charge from 60% to 90% capacity.

19.     Charging from typical daily-use levels requires over 20 hours - rendering the vehicles unusable for normal transportation.

20.     The charging system shuts down without warning, forcing Plaintiffs to wake during night hours to restart the process.

21.     VINFAST's service representatives attempt repairs at Plaintiffs' homes due to the company's limited service infrastructure.

22.     Despite multiple repair attempts, VINFAST fails to fix the charging defects.

23.     VINFAST acknowledges the defects result from "software issues" where minor power fluctuations cause the charging system to terminate erroneously.

24.     VINFAST admits the charging problems stem from software within the company's control.

25.     Despite controlling the software causing these defects, VINFAST refuses to provide software updates or effective remedies.

26.     VINFAST offers only two inadequate solutions: install expensive new charging equipment at Plaintiffs' cost or receive no assistance.

27. Other VF 8 Plus owners report identical charging problems, which VINFAST fails to disclose to potential buyers.

28. VINFAST's vehicles perform far below industry standards - other electric vehicle manufacturers provide reliable charging at advertised rates without automatic shutdowns.

29. VINFAST knows its vehicles cannot achieve advertised charging rates but continues marketing them with false performance claims.

30. Even after receiving consumer complaints about charging defects, VINFAST continues selling vehicles without disclosing the actual charging limitations.

31. VINFAST's misrepresentations and repair failures leave Plaintiffs with vehicles unsuited for their intended purpose, causing economic harm and daily inconvenience.

## CLASS ALLEGATIONS

32. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

*"All persons or entities in the United States who, within four (4) years prior to the filing of this complaint, purchased or leased a VINFAST VF 8 PLUS vehicle that failed to charge at the advertised wattage rate (typically 6.6kW or more), resulting in materially longer charging times than represented by Vinfast."*

33. Plaintiffs also seek to represent a subclass defined as follows (the "California Subclass"):

*"All persons or entities in the State of California who, within four (4) years prior to the filing of this complaint, purchased or leased a VINFAST VF 8 PLUS vehicle that failed to charge at the advertised wattage rate (typically 6.6kW or more), resulting in materially longer charging times than represented by Vinfast."*

34. Excluded from the Class and California Subclass are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, and assigns, and

entities in which Defendant has a controlling interest; (b) governmental entities; (c) the judge to whom this case is assigned, the judge's staff, and members of their immediate families; and (d) all persons who make a timely election to be excluded from the Class.

35.    Numerosity: The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be determined through appropriate discovery, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class based on the number of VINFAST VF 8 PLUS vehicles sold nationwide and in California.

36.    Commonality: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to: a. Whether VINFAST misrepresented the charging capabilities of its electric vehicles; b. Whether VINFAST's electric vehicles can charge at the advertised wattage rates (typically 6.6kW or more); c. Whether VINFAST's misrepresentations and omissions regarding the charging capabilities of its vehicles were material to reasonable consumers; d. Whether VINFAST violated the Magnuson-Moss Warranty Act; e. Whether VINFAST violated California's Song-Beverly Consumer Warranty Act; f. Whether VINFAST violated California's Consumers Legal Remedies Act ("CLRA"); g. Whether VINFAST violated California's Unfair Competition Law ("UCL"); h. Whether VINFAST violated California's False Advertising Law ("FAL"); i. Whether VINFAST breached express warranties made to consumers regarding the charging capabilities of its vehicles; j. Whether VINFAST breached implied warranties regarding the charging capabilities of its vehicles; k. Whether VINFAST's conduct constitutes breach of contract; l. Whether Plaintiffs and Class members are entitled to damages, restitution, disgorgement, and/or other remedies; and m. The amount and nature of relief to be awarded to Plaintiffs and the Class.

37.    Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs and all Class members were similarly injured through Defendant's uniform misconduct as described herein. Plaintiffs and all members of the Class purchased or leased VINFAST vehicles with charging capabilities that did not perform as advertised, and all have suffered similar harm as a result of VINFAST's misconduct.

38.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

39.    Ascertainability: Class members can be readily identified and ascertained through VINFAST's sales and lease records, vehicle identification numbers (VINs), vehicle registration records, and other objective criteria.

40.    With respect to claims seeking primarily injunctive and declaratory relief, Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

41.    With respect to claims seeking primarily monetary relief common questions of law and fact predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant, making it impracticable for Class members to individually seek redress for Defendant's wrongful conduct.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, ET SEQ.)**
**(On Behalf of Plaintiffs and the Class)**

42.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

43.    Plaintiffs bring this count on behalf of themselves and the Class.

44.    The VINFAST VF 8 PLUS vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

45.    Plaintiffs and Class members are "consumers" within the meaning of 15 U.S.C. § 2301(3).

46.    VINFAST is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5).

47.    VINFAST provided Plaintiffs and Class members with written warranties within the meaning of 15 U.S.C. § 2301(6).

48.    VINFAST breached these written warranties by providing vehicles that failed to charge at the rates represented by VINFAST, instead charging at materially lower rates requiring nearly 24 hours for full charging.

49.    The charging defects substantially impair the vehicles' utility, as demonstrated by the need for over 20 hours to charge from typical daily-use battery levels and the necessity of awakening during overnight hours to restart the charging process when it automatically shuts down.

50.    VINFAST has been unable to repair the charging defects despite multiple attempts, and has acknowledged that the charging problems are caused by software issues within VINFAST's control.

51.    VINFAST's failure to cure the defect within a reasonable time has caused the written warranties to fail of their essential purpose.

52.    As a direct and proximate result of VINFAST's breach of written warranties, Plaintiffs and Class members have suffered damages including diminution in vehicle value, loss of use, and substantial inconvenience.

53.    Plaintiffs and the Class are entitled to costs and expenses, including attorney's fees, under 15 U.S.C. § 2310(d).

**SECOND CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA'S SONG-BEVERLY CONSUMER WARRANTY ACT**
**(CAL. CIV. CODE § 1790 ET SEQ.)**
**(On Behalf of Plaintiffs and the California Subclass)**

54.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

55.    Plaintiffs bring this count on behalf of themselves and the California Subclass.

56.    Plaintiffs and the California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b), including lessees under Cal. Civ. Code § 1795.4.

57.    The VINFAST vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

58.    VINFAST is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

59.    VINFAST provided Plaintiffs and the California Subclass members with express and implied warranties regarding the vehicles' charging capabilities and performance.

60.    VINFAST breached these warranties by delivering vehicles that charge at significantly lower rates than represented, requiring nearly 24 hours for full charging instead of the fast charging times that were represented.

61.    The charging defect substantially impairs the use, value, and safety of the VINFAST vehicles because: (a) the vehicles require impractically long charging times; (b) the charging system unpredictably shuts down requiring manual intervention including during overnight hours; (c) the extended charging times make the vehicles impractical for daily transportation needs; and (d) the charging performance falls substantially below that of other electric vehicles in the marketplace.

62. Plaintiffs and the California Subclass members presented their vehicles to VINFAST for repair of the charging defects.

63. Despite multiple repair attempts, VINFAST and its authorized repair facilities have been unable to conform the vehicles to the applicable warranties after a reasonable number of attempts.

64. VINFAST has acknowledged that the charging defects are caused by software issues, demonstrating VINFAST's knowledge of the defects and their cause.

65. Despite having knowledge of the defects and despite having a reasonable opportunity to cure them, VINFAST has failed to provide effective remedies.

66. VINFAST's conduct constitutes willful failure to comply with its Song-Beverly obligations.

67. As a direct and proximate result of VINFAST's breach of express and implied warranties, Plaintiffs and the California Subclass have been damaged.

68. Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the California Subclass are entitled to restitution, replacement, refund, reasonable attorney's fees, costs, and civil penalties of up to two times actual damages under Cal. Civ. Code § 1794(c).

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
### (On Behalf of Plaintiffs and the Class)

69. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

70. VINFAST made express warranties regarding the charging capabilities of its vehicles through marketing materials, advertisements, dealership representations, and written warranty documentation.

71. These express warranties included representations that the vehicles would charge rapidly and at rates consistent with Level 2 or higher EV charging capabilities.

72.    These express warranties became part of the basis of the bargain between VINFAST and Plaintiffs and Class members.

73.    VINFAST breached these express warranties by delivering vehicles that charge at significantly lower rates than warranted, requiring nearly 24 hours for full charging and making the vehicles impractical for their intended use.

74.    The charging performance delivered is materially different from what was expressly warranted, as evidenced by the extended charging times and need for constant monitoring and manual intervention.

75.    As a direct and proximate result of VINFAST's breach of express warranties, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability**
**(On Behalf of Plaintiffs and the Class)**

76.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

77.    VINFAST is a merchant and seller of electric vehicles within the meaning of the Uniform Commercial Code as adopted in California and other states.

78.    The VINFAST vehicles were subject to implied warranties of merchantability running from VINFAST to Plaintiffs and Class members.

79.    VINFAST impliedly warranted that the vehicles were of merchantable quality and fit for the ordinary purpose for which electric vehicles are used.

80.    The VINFAST vehicles are not merchantable because they are not fit for the ordinary purposes for which electric vehicles are used, namely reliable and reasonably efficient charging for daily transportation needs.

81.    The vehicles' charging defects, including extended charging times of nearly 24 hours and unpredictable charging shutdowns requiring manual intervention, render them unfit for ordinary use as electric vehicles.

82.     As a direct and proximate result of VINFAST's breach of the implied warranty of merchantability, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750 ET SEQ.)
### (On Behalf of Plaintiffs and the California Subclass)

83.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

84.     Plaintiffs bring this count on behalf of themselves and the California Subclass.

85.     The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

86.     Plaintiffs and the California Subclass members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

87.     The VINFAST vehicles are "goods" within the meaning of Cal. Civ. Code § 1761(a).

88.     VINFAST's acts and practices, as described herein, violate the CLRA because they include, but are not limited to, the following: a. Representing that goods have characteristics, uses, benefits, or qualities that they do not have (Cal. Civ. Code § 1770(a)(5)); b. Representing that goods are of a particular standard, quality, or grade, if they are of another (Cal. Civ. Code § 1770(a)(7)); c. Advertising goods with intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)); and d. Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

89.     VINFAST violated the CLRA by representing, through its advertisements, warranties, and other express representations, that its electric vehicles could charge at

rapid rates when, in fact, the vehicles charge at significantly lower rates, requiring nearly 24 hours for full charging.

90.    VINFAST knew or should have known that its representations about the charging capabilities of its vehicles were false or misleading.

91.    VINFAST's misrepresentations and omissions regarding the charging capabilities of its vehicles were material to reasonable consumers because they relate to a fundamental feature of electric vehicles that affects their practicality and usability.

92.    Plaintiffs and the California Subclass are initially only seeking injunctive relief under the CLRA. Pursuant to Cal. Civ. Code § 1782(d), Plaintiffs and the California Subclass are entitled to seek injunctive relief without providing the notice required by Cal. Civ. Code § 1782(a).

93.    Plaintiffs expressly reserve the right to amend this Complaint to seek monetary damages under the CLRA following service of a CLRA notice letter compliant with Cal. Civ. Code § 1782(a) and the expiration of the applicable notice period.

94.    The injunctive relief sought by Plaintiffs and the California Subclass includes, but is not limited to, an order prohibiting VINFAST from continuing its unfair and deceptive practices with respect to the charging capabilities of its vehicles.

**SIXTH CAUSE OF ACTION**
**False Advertising (Cal. Bus. & Prof. Code § 17500)**
**(On Behalf of Plaintiffs and the California Subclass)**

95.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

96.    VINFAST engaged in false and misleading advertising by promoting its vehicles as having rapid charging capabilities when the vehicles charge at significantly reduced rates.

97.    These representations were false and misleading because the vehicles require nearly 24 hours for full charging, far exceeding reasonable charging times for electric vehicles.

**COMPLAINT**

98.    VINFAST made these false representations with knowledge of their falsity or with reckless disregard for the truth, as evidenced by VINFAST's acknowledgment that the charging defects are caused by software issues within its control.

99.    VINFAST's false representations were material because charging capability directly affects electric vehicle practicality and value.

100.    Plaintiffs relied on these misrepresentations in entering their lease agreements.

101.    As a result of this reliance, Plaintiffs suffered economic injury, loss of use of their vehicles, substantial inconvenience from charging failures, and additional time and costs attempting to make the vehicles function as represented.

**SEVENTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

102.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

103.    Plaintiffs entered into valid and binding lease agreements with VINFAST for the lease of VF 8 Plus vehicles.

104.    The lease agreements contained express and implied terms that the vehicles would perform as represented by VINFAST, including charging at advertised speeds and rates consistent with industry standards.

105.    VINFAST's pre-lease representations regarding the vehicles' charging capabilities, including representations about rapid charging speeds and Level 2 charging compatibility, became integrated terms of the lease agreements and created contractual obligations regarding vehicle performance.

106.    As part of the lease agreements, VINFAST was contractually obligated to deliver vehicles that: (a) could charge at the advertised amperage rates; (b) would provide reasonable charging times suitable for daily transportation; (c) would function reliably without requiring constant user intervention; and (d) would perform consistently with industry standards for electric vehicles.

107. Plaintiffs performed their obligations under the lease agreements by making required lease payments and complying with the lease terms.

108. VINFAST materially breached the lease agreements by delivering vehicles that fundamentally failed to perform as contracted, specifically by: (a) providing vehicles that cannot charge at advertised 32-amp rates; (b) delivering vehicles that require nearly 24 hours for full charging instead of reasonable charging times; (c) providing vehicles with charging systems that shut down unpredictably, requiring manual intervention and nighttime restarts; and (d) failing to provide vehicles suitable for ordinary daily transportation use.

109. VINFAST's breach was material because it goes to the essence of the lease agreements - providing functional electric vehicles suitable for the purpose for which they were leased.

110. The charging defects render the vehicles substantially different from what was contracted for, depriving Plaintiffs of the fundamental benefit of their bargain.

111. As a direct and proximate result of VINFAST's material breach, Plaintiffs were deprived of the benefit of their bargain and suffered damages including: (a) lease payments for non-conforming vehicles; (b) diminished value of the leased vehicles; (c) loss of use and utility; (d) substantial inconvenience including constant monitoring requirements; (e) additional time and costs attempting to make the vehicles function as contracted; and (f) opportunity costs from limited mobility and transportation options.

112. Plaintiffs are entitled to damages, restitution, and other appropriate relief for VINFAST's breach of the lease agreements.

### EIGHTH CAUSE OF ACTION
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200)**
**(On Behalf of Plaintiffs and the California Subclass)**

113. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

114. Plaintiffs bring this count on behalf of themselves and the California Subclass.

115.   California's Unfair Competition Law (UCL") prohibits "unlawful, unfair or fraudulent" business acts or practices. Cal. Bus. & Prof. Code § 17200.

116.   Plaintiffs have standing to bring this UCL claim because they suffered economic injury as a result of VINFAST's unfair business practices by receiving vehicles worth substantially less than represented and incurring additional costs due to the charging defects.

117.   Unlawful Conduct: VINFAST's conduct violates the UCL's "unlawful" prong because it constitutes unlawful business practices, including violations of the Song-Beverly Consumer Warranty Act, the Consumers Legal Remedies Act, the False Advertising Law, and the Magnuson-Moss Warranty Act, as alleged herein.

118.   Unfair Conduct: VINFAST's conduct also violates the UCL's "unfair" prong because it frustrates reasonable consumer expectations that electric vehicles will charge at advertised rates rather than require nearly 24 hours for full charging. VINFAST's conduct is unfair because: (a) consumers reasonably expected industry-standard charging performance based on VINFAST's representations; (b) VINFAST has acknowledged that the charging defects are caused by software issues within its control but has failed to remedy them; (c) VINFAST continued selling and leasing vehicles without disclosing the actual charging limitations; and (d) less harmful alternatives existed, including fixing the software issues, providing full disclosure of charging limitations, or offering vehicle buy-backs.

119.   VINFAST's unfair conduct harms not only consumers but also competition in the electric vehicle marketplace by allowing VINFAST to compete unfairly against manufacturers whose vehicles perform as advertised.

120.   As a result of VINFAST's unlawful and unfair business practices, Plaintiffs and the California Subclass have been injured and are entitled to restitution of money paid for vehicles that do not perform as represented.

121.   Plaintiffs and the California Subclass seek restitution, disgorgement of profits, and injunctive relief under the UCL to prevent VINFAST from continuing its unlawful and unfair business practices.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1.   Certification of the Class and California Subclass,
2.   For restitution and/or rescission of the lease agreements;
3.   For general, special, and consequential damages under all causes of action except the CLRA claim, as to which Plaintiffs initially seek only injunctive relief;
4.   For attorneys' fees and costs under applicable statutes including Cal. Civ. Code § 1794, 15 U.S.C. § 2310(d), and other applicable laws;
5.   For civil penalties of up to two times actual damages under Cal. Civ. Code § 1794(c);
6.   For statutory damages under the CLRA (following proper notice and opportunity to cure);
7.   For restitution and disgorgement of profits under the UCL;
8.   For punitive damages where permitted by law;
9.   An order compelling VINFAST to buy back the vehicles or provide adequate remedy;
10.   For injunctive relief prohibiting Defendant from engaging in further unfair and deceptive business practices regarding the advertising and sale of electric vehicles with false charging capability representations;
11.   For declaratory relief as appropriate; and
12.   For such other and further relief as the Court deems just and proper.

# DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury on all causes of action so triable.


Dated:  June 19, 2025                    INGBER LAW GROUP


                                         */s/ Jason M. Ingber*
                                         Jason M. Ingber (SBN 318323)
                                         Serach B. Shafa (SBN 358332)
                                         3580 Wilshire Blvd., Suite 1260
                                         Los Angeles, California 90010
                                         Telephone: (213) 805-8373
                                         E-mail: ji@jasoningber.com
                                         Attorneys for Plaintiffs
                                         GIL ABRAHEM SWIGI, JOSEPH MIZRAHI
                                         and the Proposed Class

# EXHIBIT A

# MOTOR VEHICLE LEASE AGREEMENT – CLOSED-END – CALIFORNIA



## 1.  LESSEE AND LESSOR

**LESSEE AND CO-LESSEE**
Name: GIL ABRAHEM SWIGI
Address: ▨▨▨▨

County: LOS ANGELES

**LESSOR**
Name: VINFAST AUTO LLC
Address:
790 N SAN MATEO
SAN MATEO CA 94401

**VEHICLE GARAGING ADDRESS** (if different from Lessee/Co-Lessee address):
N/A

**LEASE NUMBER**  N/A                **LEASE DATE** 08/08/2024

The words "you" and "your" mean each person named as a Lessee or Co-Lessee above. The words "we", "us" and "our" mean the Lessor named above and USB Leasing LT or its successors and assigns ("Assignee"), to whom this Motor Vehicle Lease Agreement ("Lease") will be assigned. "Vehicle" means the leased vehicle described below, including all equipment, parts, accessories and accessions. You agree to lease the Vehicle from us according to the terms and conditions of this Lease. The consumer lease disclosures contained in this Lease are also made on behalf of Assignee.

## 2.  VEHICLE DESCRIPTIONS
### A.  LEASED VEHICLE

| | Year | Make | Model | Body Style | Odometer Reading | Vehicle Identification Number |
|---|---|---|---|---|---|---|
| ☐ New | | | | | | |
| ☐ Used | 2024 | VINFAST | VF 8 | PLUS AWD 87.7 KWH | 50 | RLLV1AFAXRH004893 |

Primary Use of Vehicle:
**The primary use of the Vehicle is for personal, family, or household purposes.**

You acknowledge that you have received and examined the Vehicle described above, that the Vehicle is equipped as described and is in good operating order and condition. You accept the Vehicle for all purposes of this Lease.

B.   TRADE-IN VEHICLE: Year _N/A_    Make _N/A_    Model _N/A_

Gross Allowance $ _N/A_        Amount Owed $ _N/A_        Net Trade-in Allowance $ 0.00

C.   FOR USE BY LESSOR: Trade-in, turn-in, and other individualized agreements:

N/A

| 3. **AMOUNT DUE AT LEASE SIGNING OR DELIVERY** | 4. **MONTHLY PAYMENTS** | 5. **OTHER CHARGES** (Not part of your Monthly Payment) | 6. **TOTAL OF PAYMENTS** (The amount you will have paid by the end of the Lease) |
|---|---|---|---|
| (Itemized below)* | A.  Your first Monthly Payment of $ 361.58 is due on the Lease Date, followed by 35 payments of $ 361.58 due on the 8TH of each month. | A.  Termination Fee (if you do not purchase the Vehicle) $ 395.00 | $ 23,120.30 |
| $ 10,070.00 | B.  The total of your Monthly Payments is $ 13,016.88. | B.  Total $ 395.00 | (Sections 3 plus 4(B) plus 5(B) minus Sections 7(A)(3) minus 7(A)(4)) |

## 7. *ITEMIZATION OF AMOUNT DUE AT LEASE SIGNING OR DELIVERY

**A.  Amount Due at Lease Signing or Delivery:**

| | | |
|---|---|---|
| (1) Capitalized Cost Reduction | $ 7,508.96 |
| (2) Sales/Use Tax on Capitalized Cost Reduction | 713.35 |
| (3) First Monthly Payment | 361.58 |
| (4) Refundable Security Deposit | N/A |
| (5) Title Fees | N/A |
| (6) Registration Fees | 98.00 |
| (7) Upfront Sales/Use Tax on Vehicle | N/A |
| (8) California Tire Fee (paid to State) | 7.00 |
| (9) Electronic Vehicle Registration or Transfer Charge (Not a governmental fee) | 33.00 |
| (10) Document Processing Charge (Not a governmental fee) | 85.00 |

| | |
|---|---|
| (11) Acquisition Fee | 695.00 |
| (12) LICENSE-280.00/SMOG ABATE-20.00 | 300.00 |
| (13) OTHER TA-74.11/TRANSPOR-194.00 | 268.11 |
| (14) Total | $ 10,070.00 |

**B.   How the Amount Due at Lease Signing or Delivery will be Paid:**

| | | |
|---|---|---|
| (1) Net Trade-in Allowance | $ 0.00 |
| (2) Rebates and Noncash Credits | 7,500.00 |
| (3) Amount to be Paid in Cash | 2,570.00 |
| (4) Total | $ 10,070.00 |

**(Continued on Page 2)**

(Continued from Page 1)

**8. YOUR MONTHLY PAYMENT IS DETERMINED AS SHOWN BELOW:**

A. **Gross Capitalized Cost.** The agreed upon value of the Vehicle ($ 43,100.00 ) and any items you pay over the Lease
Term (such as taxes, fees, service contracts, insurance, and any outstanding prior credit or lease balance) . . . . . . . . . . . . . . .  $  43,225.00

B. **Capitalized Cost Reduction.** The amount of any Net Trade-in Allowance, rebate, noncash credit, or cash you pay that
reduces the Gross Capitalized Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  −  7,508.96

C. **Adjusted Capitalized Cost.** The amount used in calculating your Base Monthly Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . .  =  35,716.04

D. **Residual Value.** The value of the Vehicle at the end of the Lease used in calculating your Base Monthly Payment . . . . . . . . .  −  23,850.00

E. **Depreciation and any Amortized Amounts.** The amount charged for the Vehicle's decline in value through normal use and
for other items paid over the Lease Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  =  11,866.04

F. **Rent Charge.** The amount charged in addition to the Depreciation and any Amortized Amounts . . . . . . . . . . . . . . . . . . . . . . .  +  21.52

G. **Total of Base Monthly Payments.** The Depreciation and any Amortized Amounts plus the Rent Charge . . . . . . . . . . . . . . . .  =  11,887.56

H. **Lease Payments.** The number of payments in your Lease (Lease Term ___36___ months) . . . . . . . . . . . . . . . . . . . . . .  ÷  36

I. **Base Monthly Payment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  =  330.21

J. **Monthly Sales/Use Tax** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  +  31.37

K. N/A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  +  N/A

L. **Total Monthly Payment** ("Monthly Payment") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  = $  361.58

---

**Early Termination.** You may have to pay a substantial charge if you end this Lease early. The charge may be up to several thousand dollars.
The actual charge will depend on when the Lease is terminated. The earlier you end the Lease, the greater this charge is likely to be.

---

**9. EXCESSIVE WEAR AND USE**

You may be charged for excessive wear based on our standards for normal use and for mileage in excess of 10,000 miles per year at the
rate of $ 0.25 per mile. No rebate or credit will be paid to you if the mileage is less than the specified amounts.

**10. PURCHASE OPTION AT END OF LEASE TERM**

If you have fully performed all of your obligations under this Lease, including paying the total of your Monthly Payments and all other amounts due under
this Lease, then you (the Lessee or Co-Lessee only) have an option to purchase the Vehicle AS IS at the end of the Lease Term for $ 24,200.00 *,
plus any taxes, official fees and other charges related to such purchase. *Includes a purchase option fee of $350.

**Other Important Terms.** See all six pages of this Lease for additional information on early termination, purchase options and maintenance responsibilities,
warranties, late and default charges, insurance, and any security interest, if applicable.

---

### 11. ITEMIZATION OF GROSS CAPITALIZED COST

| | | |
|---|---|---:|
| A. | Agreed Upon Value of Vehicle as Equipped at Lease signing | $ 43,100.00 |
| B. | Sales/Use Tax | N/A |
| C. | Initial Title, Registration, and License Fees | N/A |
| D. | Outstanding Prior Credit or Lease Balance | N/A |
| E. | Acquisition Fee | N/A |
| F. | Document Processing Charge (Not a governmental fee) | N/A |
| G. | Mechanical Breakdown Protection Contract | N/A |
| H. | Credit Insurance | |
| | 1. Single Credit Life          N/A | |
| | 2. Joint Credit Life           N/A | |
| | 3. Credit Disability           N/A | |
| I. | Total Credit Insurance (H 1+2+3) | N/A |
| J. | Maintenance Contract          N/A | |
| K. | Service Contract (describe) N/A     N/A | |
| L. | Total Service Contracts (J+K) | N/A |
| M. | Extended Warranty Contract (non-insurance product) | N/A |
| N. | Accessories/Optional Equipment (to be added after lease signing): | |
| | 1. FLOOR MATS | 125.00 |
| | 2. N/A | N/A |
| | 3. N/A | N/A |
| | 4. N/A | N/A |
| | 5. N/A | N/A |
| | 6. N/A | N/A |
| O. | California Tire Fees | N/A |
| P. | Electronic Vehicle Registration or Transfer Charge (Not a governmental fee) | N/A |
| Q. | Other (describe) N/A | N/A |
| R. | Other (describe) N/A | N/A |
| S. | Other (describe) N/A | N/A |
| T. | Other (describe) N/A | N/A |
| U. | **Total = Gross Capitalized Cost** | $ 43,225.00 |

**12. ESTIMATED OFFICIAL FEES AND TAXES**

The total estimated amount you will pay for official and license fees, registration, title and taxes over the term of your Lease, whether included with
your Monthly Payments or assessed otherwise: $ 3,050.78 . This is an estimate based on current tax rates, the actual total of fees
and taxes may be higher or lower, depending on the tax rate in effect or the value of the Vehicle at the time a fee or tax is assessed.

---

**13. WARRANTIES AND OPTIONAL PRODUCTS**

If the Vehicle is new, it is covered by the standard manufacturer's new vehicle warranty. If the Vehicle is new or used, it is not covered by any other express warranty unless identified below:

☒ The Vehicle is covered by the remainder of the standard manufacturer's new vehicle warranty.

☐ The Vehicle is covered by an extended warranty purchased from the manufacturer or other third party provider.

☐ N/A _____ .

We assign to you all rights we have under any of these warranties. You acknowledge that you have received a copy of the indicated warranties.

**You expressly agree and understand that you have selected and agreed to lease the Vehicle "AS IS." WE MAKE NO WARRANTIES OR REPRESENTATIONS, EITHER EXPRESS OR IMPLIED AS TO THE VEHICLE OR ANY PART OR ACCESSORY THEREOF. WE MAKE NO WARRANTY OF MERCHANTABILITY OR FITNESS OF THE VEHICLE FOR ANY PARTICULAR PURPOSE OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER.**

---

**You are not required to buy any of the optional insurance or other products listed below to enter into the Lease and your decision not to do so will not be a factor in the approval of this extension of credit.** These insurance and other products will not be provided unless you sign below and are accepted by the Provider. If you sign below, you acknowledge receipt of a notice of the terms of the insurance or product, you want to obtain the insurance or product checked, and you agree to pay the premium or charge shown.

☐ **Credit Life Insurance**

  ☐ Credit Life

    Initial Coverage: $ N/A _____   ☐ Single   Cost: $ N/A _____

    ☐ Joint   Cost: $ N/A _____

  ☐ Credit Disability

    Maximum Monthly

    Coverage: $ N/A _____   ☐ Joint   Cost: $ N/A _____

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Lessee is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR A CHIROPRACTOR IN THE LAST SIX MONTHS. (Refer to "Total Disabilities Not Covered" in your policy for details.)

| N/A | X N/A | N/A |
|---|---|---|
| Date | Primary Lessee Signature | Age |

| N/A | X N/A | N/A |
|---|---|---|
| Date | Co-Lessee Signature | Age |

☐ **Mechanical Breakdown Protection Contract**

| N/A | $ N/A | N/A  N/A |
|---|---|---|
| Provider | Cost | mo./mileage |

| X N/A | X N/A | |
|---|---|---|
| Lessee Signature | Co-Lessee Signature | |

☐ **Maintenance or Service Contract**

| N/A | $ N/A | N/A  N/A |
|---|---|---|
| Provider | Cost | mo./mileage |

| X N/A | X N/A | |
|---|---|---|
| Lessee Signature | Co-Lessee Signature | |

☐ **Extended Warranty Contract** (non-insurance product)

| N/A | $ N/A | N/A |
|---|---|---|
| Provider | Cost | mo./mileage |

| X N/A | X N/A | |
|---|---|---|
| Lessee Signature | Co-Lessee Signature | |

---

**14. INSURANCE VERIFICATION**

The Vehicle is insured by:

| Policy Number | Insurance Company | Insurance Agent | Agent Address | Agent Phone Number |
|---|---|---|---|---|
| 4582842987 | GEICO | GEICO | P.O BOX 509090, SAN DIEGO, CA 92150 | (800) 861-8380 |

You authorize us to verify and give your agent authorization to place the minimum coverage required by this Lease (see Section 16).

**15. LATE CHARGE; RETURNED PAYMENT CHARGE**

If all or any portion of a Monthly Payment or any other amount due under this Lease is not received within 10 days after it is due, you will pay a late charge of $25.

If any payment is returned to us unpaid for any reason, including, but not limited to, non-sufficient funds, you will pay a returned payment charge of $20, to the extent not prohibited by applicable law.

**16. INSURANCE**

Unless otherwise agreed, you must provide insurance coverage in the amount and types indicated below at your expense during the Lease Term and until the Vehicle is returned to us:

A. Fire, theft and comprehensive insurance with a maximum deductible of $500;

B. Collision insurance with a maximum deductible of $500;

C. Liability insurance for bodily injury or death to any one person in the amount of $100,000 and for any one accident in the amount of $300,000 or combined single limit coverage of $300,000;

D. Property damage insurance for $50,000; and

E. Uninsured and underinsured motorist coverage and any other insurance required by the state where the Vehicle is registered.

The insurance policy must name us as loss payee and an additional insured. The policy also must require the insurance company to notify us 10 days before any cancellation or changes in insurance coverage. You will notify us and your insurance company within 24 hours after any damage, loss, theft, seizure or impoundment of the Vehicle. You assign to us any amounts payable under such insurance policies. You agree that we may endorse your name upon any check, draft, order or other similar instrument representing payment to you of such amounts.

**The insurance listed above is required in connection with this Lease. You have the option of providing the required insurance through an existing policy of insurance owned or controlled by you or through a policy paid for by you and obtained from any insurance company authorized to transact business in the state in which this Lease was signed. We may for reasonable cause decline the insurance provided by you. PHYSICAL DAMAGE OR LIABILITY INSURANCE COVERAGE FOR BODILY INJURY OR PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED IN THIS LEASE.**

**17. VEHICLE OPERATION**

A. VEHICLE MAINTENANCE AND OPERATING COSTS. You agree to maintain the Vehicle in good working order and operating condition and have all necessary repairs made. You are responsible for all costs of maintaining and servicing the Vehicle. You agree to have the Vehicle serviced and repaired according to the manufacturer's recommendations and to ensure that the warranty, if any, remains valid. If applicable, you will charge and maintain the electric vehicle battery according to manufacturer and warranty requirements. You will keep all maintenance and repair records. You agree to comply with all manufacturer recall notices. You agree to pay for all operating costs including, but not limited to as applicable, gas, oil, antifreeze, electric vehicle battery charging and maintenance, traffic and parking tickets or violations, towing and replacement tires.

B. VEHICLE USE. You will: (1) allow the Vehicle to be operated only by licensed and insured drivers; (2) not use the Vehicle for any improper or illegal purpose, or to commit any illegal act; (3) not use the Vehicle to transport passengers or goods for hire, including but not limited to use as taxi cab, limousine, ride service, delivery service, for livery, as a municipal vehicle, ambulance, hearse, or in driver education; (4) not use the Vehicle in any way

that causes the cancellation or suspension of any applicable insurance or manufacturer's warranty; (5) not use the Vehicle in towing, snow plowing, construction, or for hauling; (6) not remove the Vehicle from the state where you reside for more than 30 consecutive days without our prior written approval (for purposes of this Section 17(B)(6), the state where you reside is the state where the Vehicle was originally titled on the Lease Date or, if applicable, the most recent state where we permitted you to title the Vehicle); (7) not remove the Vehicle from the contiguous United States for any period of time; (8) not change or modify the Vehicle in any way without our prior written approval, except for normal maintenance; and (9) deliver the Vehicle to such location that we require for our inspection at any time during the Lease Term. **You will not assign or sublease any interest in the Vehicle or the Lease without our written consent.**

C. TAXES, REGISTRATION AND TITLING. You agree to pay all title, registration, license, inspection, testing, and other fees, taxes and charges imposed by government authorities in connection with the Vehicle, this Lease or any amounts due or payable arising from this Lease. If such amounts are assessed for a period during the Lease Term, you will pay them even if they become due after the Lease Term.

You agree to title, register and license the Vehicle in the state in which it is garaged. You must request any power of attorney required from us to title, register or license the Vehicle. You agree to pay a $25 title transfer fee each time the Vehicle is retitled.

**If the Vehicle is registered in a jurisdiction which assesses personal property taxes, you agree to pay the personal property tax.**

D. RELEASE OF INFORMATION. You agree that we may provide information about you to government authorities upon their request for the purpose of enforcing any fees, charges, penalties, etc. related to your use or ownership of the Vehicle.

**18. PURCHASE OPTION**

A. END OF LEASE TERM. At scheduled Lease termination, you have an option to purchase the Vehicle AS IS as set forth in Section 10 of this Lease.

B. PRIOR TO END OF LEASE TERM. At any time prior to scheduled Lease termination, you have an option to purchase the Vehicle AS IS. The Purchase Option Price will be a sum equal to: (1) the amount set forth in Section 10; **plus** (2) the Termination Liability set forth in Section 22(C), excluding the items set forth in Sections 22(C)(1), (C)(4), (C)(6) and (C)(7).

C. TRUE LEASE. This is a true lease and you will not own or have any equity in the Vehicle or its replacement parts unless you exercise the option to purchase the Vehicle.

**19. EXCESS WEAR AND USE**

We have based the Monthly Payment on the assumption that you will not subject the Vehicle to excess wear and use. You agree not to expose the Vehicle to excess wear and use. If you do so and if you do not purchase the Vehicle at the scheduled end of the Lease Term, you agree to pay us the amount that it would cost to make all repairs to the Vehicle that are not the result of normal wear whether or not we, in our sole discretion, actually make the repairs. Any excess wear and use assessed at scheduled termination of this Lease will be based upon an estimate of the repair cost unless we actually make the repairs.

Excess wear and use includes, but is not limited to, the amount it would cost to repair: (1) inoperative mechanical parts, including power accessories; (2) dented, scratched, chipped or rusted areas on the body; (3) mismatched paint or any special identification mark; (4) cracked, scratched, pitted or chipped windows, broken or discolored windows or inoperative window mechanisms; (5) broken headlight lenses or sealed beams; (6) scratches more than two inches long through the chrome on bumpers or bumper dents; (7) broken grilles or dents in the grilles; (8) single dents or a series of dents on other trim parts, including headlight and tail light bezels; (9) electronic malfunctions; (10) seats, seat belts, headlining, dashboards, door panels or carpeting which is torn or damaged beyond ordinary wear and tear or is burned; (11) major fluid leaks; (12) damaged exhaust systems; (13) damage from flood, water, hail or sand; (14) damage which makes the Vehicle either unsafe or unlawful to operate; (15) all damage which would be covered by the required comprehensive, collision and upset insurance whether or not such insurance actually is in force; and (16) the Vehicle to restore any original equipment or accessories which were removed or altered during the Lease Term.

Excess wear and use also includes, but is not limited to, the amount it would cost to replace: (1) any tire not part of a matching set of five tires (or four with emergency "doughnut" spare if initially so equipped); (ii) any tires with less than 1/8 inch of tread remaining at the shallowest point; (iii) any tire with gouged, cut, torn or plugged sidewalls; (iv) any missing or dented parts, accessories and adornments, including bumpers, jacks, ornamentation, aerials,

hubcaps, chrome stripping, rear view mirrors, radio and stereo components or spare tire; or (v) any parts which are not original manufacturer equipment or of equal quality and design.

**Only an inspection company designated by us is authorized to conduct an inspection to determine excess wear and use.**

**20. VEHICLE RETURN**

If you do not exercise your Purchase Option, you must return the Vehicle to us at the time and place we specify. If you fail to return the Vehicle, you must continue to make your Monthly Payment to us on a month-to-month basis as approved by us, but in no circumstance can the Lease Term continue for more than 6 months beyond the scheduled Lease termination date. **Unless this Lease ends under another section of this Lease, if you fail to return the Vehicle within 72 hours after expiration of the scheduled Lease Term, we may report the Vehicle as stolen.** You must provide a method for us to contact you if the Vehicle is not returned on time. We will use the contact information you provided when you applied for the Lease. If the information provided changes during the Lease Term, you agree to notify us with updated contact information.

**21. SCHEDULED TERMINATION**

Except for Early Termination, this Lease will terminate or end upon:

A. The end of the Lease Term;
B. Return of the Vehicle;
C. Completion of a signed odometer statement; and
D. Payment of the following amounts:
   (1) The Termination Fee;
   (2) Any amounts owed for Excess Wear;
   (3) Any amounts owed for Excess Mileage;
   (4) All amounts due and unpaid under this Lease; and
   (5) Any official fees and taxes due in connection with Lease termination.

**22. EARLY TERMINATION**

A. LESSEE'S RIGHT TO TERMINATE EARLY. You may terminate this Lease before the end of the Lease Term. If you do not exercise your purchase option, the charge for such Early Termination is the Early Termination Liability defined below. You must send us written notice of your early termination by registered mail 30 days before the date of termination.

B. LESSOR'S RIGHT TO TERMINATE EARLY. We may terminate this Lease before the end of the Lease Term if you are in Default. If you do not exercise your purchase option, upon such termination we shall be entitled to the Early Termination Liability defined below.

C. EARLY TERMINATION LIABILITY. The Early Termination Liability is calculated as follows:
   (1) The Termination Fee; **plus**
   (2) All unpaid amounts that are due or past due under this Lease; **plus**
   (3) Any official fees, taxes and other charges related to early termination; **plus**
   (4) All expenses related to recovering, obtaining, storing, preparing for sale and selling the Vehicle, including reasonable attorneys' fees to the extent not prohibited by law; **plus**
   (5) The Lease Balance; **plus**
   (6) The Residual Value of the Vehicle; **minus**
   (7) The Realized Value of the Vehicle.

D. LEASE BALANCE. The Lease Balance is equal to:
   (1) The Base Monthly Payment times the number of Monthly Payments not yet due; **minus**
   (2) Unearned Rent Charges included in the Base Monthly Payments not yet due calculated according to the Actuarial Method.

The term "Actuarial Method" means the method of allocating Base Monthly Payments between: (i) the reduction of the Adjusted Capitalized Cost to the Residual Value over the Lease Term; and (ii) Rent Charges. Under this method, a Base Monthly Payment is applied first to the accumulated Rent Charges and any remainder is subtracted from, or any deficiency is added to, the balance of the Adjusted Capitalized Cost.

E. REALIZED VALUE. The Realized Value will be determined in one of the following ways:
   (1) By a written agreement between you and us;
   (2) Within 10 days of early termination, you may obtain, at your own expense, from an independent third party agreeable to both you and us, a professional appraisal of the wholesale value of the Vehicle which could be realized at sale. The appraised value shall then be used as the Realized Value.
   (3) We determine the Realized Value in accordance with accepted practices in the automobile industry for determining the wholesale value of used vehicles by obtaining a wholesale cash bid for the purchase of the Vehicle or by disposing of the Vehicle in an otherwise commercially reasonable manner.

(4) If the Vehicle is subject to a total loss due to collision, destruction or unknown theft as determined by us, the Realized Value will equal the amount of any proceeds we receive from your required insurance. If there are no insurance proceeds, the Realized Value will be zero.

F. If you terminate this Lease early pursuant to the federal Servicemembers Civil Relief Act or any equivalent provisions under state law, you may be charged for excess mileage if the actual mileage of the Vehicle at Lease termination is more than the allowed miles for the time period that you actually leased the Vehicle. In this case, we will calculate the total allowed miles by prorating the annual allowed miles set out in Section 9 to the month. If you terminate this Lease early for any other reason and your Early Termination Liability includes payment to us of the remaining Base Monthly Payments, you may be charged for excess mileage only if the actual mileage of the Vehicle at Lease termination is more than the total allowed mileage for the entire Lease Term.

## 23. DEFAULT

A. DEFAULT. The following are events of default ("Default") to the extent permitted by state law:
(1) You fail to make any payment in full when due;
(2) You fail to keep any promise in this Lease or any agreement made in connection with this Lease;
(3) You fail to maintain insurance on the Vehicle as required by this Lease;
(4) You fail to return the Vehicle to us at the time and place we specify;
(5) You die, are declared incompetent, become insolvent, or a bankruptcy petition is filed by or against you or you dissolve or cease active business affairs;
(6) You make any material misrepresentation on your credit application;
(7) The Vehicle is subject to actual or threatened seizure, confiscation or levy by governmental or legal process;
(8) Your driver's license expires or is suspended, revoked, cancelled or is otherwise restricted;
(9) The Vehicle is subject to a total loss due to collision, destruction, or unknown theft; or
(10) Anything else happens that adversely affects our interest in the Vehicle or your ability to comply with your obligations under this Lease.

B. REMEDIES. If this Lease is in Default, we may take any one or more of the following actions:
(1) Terminate this Lease and your rights to use the Vehicle.
(2) Take possession of the Vehicle without prior demand, unless otherwise required by law. If the Vehicle is equipped with an electronic tracking device, you understand and agree that we may use the device to find the Vehicle and exercise our right to take possession. We may take any personal property that is in or on the Vehicle when we take it. We will hold the personal property for you for ten (10) days, but we will neither be responsible for safekeeping such property nor are we required to notify you about it. If you do not pick up the property within that time, we may dispose of it any way we determine.
(3) Recover all expenses related to enforcing this Lease and obtaining, storing and selling the Vehicle, including, without limitation, reasonable attorneys' fees and court costs, to the extent not prohibited by law.
(4) Take any reasonable action to correct the default or to prevent our loss. You agree to reimburse us for any amounts we pay to correct or cover your Default.
(5) Require you to return the Vehicle and any related records or make them available to us in a reasonable manner.
(6) Make a claim for any and all insurance, warranty, mechanical breakdown protection or maintenance contract benefits or refunds that may be available on your Default or on the termination of the Lease and apply any amount received to the amount you owe.
(7) Assess interest on all outstanding amounts owing to us under this Lease, including without limitation, amounts owing for excess wear and use and for excess mileage, at the highest rate permitted by applicable law until such amounts are paid in full.
(8) Use any remedy we have at law or in equity.

## 24. REIMBURSEMENT

You will reimburse us for and hold us harmless from any loss or damage to the Vehicle and its contents and from all claims, losses and injuries, expenses and costs related to the use, maintenance or condition of the Vehicle or its driver. If you fail to pay, you will reimburse us and pay a $25 administration fee, where permitted by law, for any fine, ticket, penalty or other amount that is paid on your behalf.

## 25. WAIVER OF GAP AMOUNT; TOTAL LOSS OF VEHICLE.

If the Vehicle is subject to a total loss due to collision, destruction or unknown theft as determined by us, we will pay to us the Gap Amount, which is the difference between the Early Termination Liability set forth in Section 22(C) and the insurance proceeds received by us on account of the total loss of the Vehicle. However, if you had in effect the vehicle insurance required under this Lease at the time of the total loss, we will waive the Gap Amount and you will pay to us the sum of: (A) all Monthly Payments overdue and any other amounts that are due or past due at the time of the loss; **plus** (B) the amount of your insurance deductible and any other amounts that were subtracted from the Vehicle's actual cash value to determine the insurance proceeds we received for the total loss; **plus** (C) any rebates of charges for warranties, mechanical breakdown protection or maintenance contracts purchased in connection with this Lease. Even if the Vehicle is insured, you must continue to pay your scheduled Monthly Payments until we receive your full insurance proceeds.

## 26. REFUNDABLE SECURITY DEPOSIT

Your Refundable Security Deposit may be used by us to pay all amounts that you fail to pay under this Lease. Upon termination of this Lease and our determination that no additional amounts may be due after Lease termination (such as personal property taxes not yet billed), we will refund to you any portion of the Refundable Security Deposit not applied to amounts you owe and fail to pay under this Lease. Your Refundable Security Deposit cannot be used as a Monthly Payment. You will not earn interest on your Refundable Security Deposit. Any interest or monetary benefit to us which may accrue as a result of our retention of the Refundable Security Deposit will neither be paid to you nor applied to reduce your obligations under this Lease.

## 27. LESSOR'S RIGHT TO CANCEL

If we are unable to assign this Lease to a financial institution within 10 business days, we have the right to cancel the Lease. You will be required to return the Vehicle to us. If the Vehicle has experienced more than normal wear and tear, you will be responsible for all costs we incur to restore the Vehicle to the same condition in which you received it. We will return to you all amounts received from you at lease closing less the amount required to restore the Vehicle's condition.

## 28. GENERAL

A. SECURITY INTEREST. You grant us a security interest, to the extent permitted by state law, in the property listed below to secure performance of your obligations under this Lease: (1) in loss proceeds of any Vehicle insurance; (2) in the proceeds of any credit life or disability insurance, mechanical breakdown protection contract or maintenance contract purchased with this Lease; and (3) any unearned premiums or refunds of any of the foregoing.

B. ODOMETER STATEMENT/OTHER DOCUMENTS. Federal Law requires that you disclose the Vehicle's odometer reading to us upon termination of this Lease or transfer of ownership. Failure to complete an odometer disclosure statement, failure to return it to us or making a false statement therein may result in fines and/ or imprisonment. You will be provided an odometer disclosure statement to complete prior to the termination of the Lease. You also agree to execute any and all documents and/or provide us with any information that we may reasonably request from you in connection with the termination of this Lease or transfer of the Vehicle.

C. OWNERSHIP. This agreement is a lease only. We are the owner of the Vehicle. You have no rights of ownership or title to the Vehicle unless you exercise your purchase option. You will not allow any lien or encumbrance to attach to the Vehicle.

D. RIGHT OF SET-OFF. We may apply any money in any deposit account you have with us and on which your name appears as owner or co-owner, or any credit balance in your lease account to the payment of amounts you owe to us including lease termination charges as detailed in this Lease.

E. ENFORCEABILITY. This Lease will be governed and enforced by the laws of California. Each Lessee is responsible, individually and together, under this Lease. This is known as "joint and several" responsibility. If any provision of this Lease is found unenforceable by any court, the remaining provisions of the Lease will remain in full force and effect.

F. WARRANTY OF AMOUNT OWED. You promise that the Amount Owed on any trade-in vehicle is accurate. If the Amount Owed is more than the amount shown in the Description of Trade-In Vehicle on the front of this Lease, you will pay Lessor the excess amount upon demand.

G. **EXPRESS CONSENT TO CONTACT YOU. By providing us with a telephone number for a cellular phone or other wireless device, including a number that you later convert to a cellular number, you are expressly consenting to receiving communications – including but not limited to prerecorded or artificial voice message calls, text messages, and calls made by an automatic telephone**

dialing system – from U.S. Bank and our affiliates and agents at that number. This express consent applies to each such telephone number that you provide to us now or in the future and permits such calls for non-marketing purposes. Calls and messages may incur access fees from your cellular provider.

H. **ENTIRE AGREEMENT. Important: Read before signing. The** terms of this Lease should be read carefully because only

those terms in writing are enforceable. No other terms or oral promises not contained in this Lease may be legally enforced. The terms of this Lease may only be changed by a written agreement signed by you and us. This Lease is a final expression of the credit agreement between you and us. This Lease may not be contradicted by evidence of any prior oral credit agreement or of a contemporaneous oral credit agreement between you and us.

**29. ARBITRATION. This Section does not apply to any dispute in which the amount in controversy is within the jurisdiction limits of, and is filed in, a small claims court, and you and we retain rights to self-help remedies, such as repossession. You agree that if a dispute of any kind arises out of this agreement, either you or we can choose to have that dispute resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or to have a jury trial on that claim, or to engage in pre- arbitration discovery, except as provided for in the arbitration rules specified in this provision. In addition, you will not have the right to participate as a representative or member of any class of claimants pertaining to any claim subject to arbitration. The arbitrator's decision will generally be final and binding. Other rights that you would have if you went to court may also not be available in arbitration. It is important that you read this entire arbitration provision carefully before accepting the terms of this agreement.**

**Any claim, dispute or controversy (whether in contract, tort, or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to (a) the credit or services offered or provided to you, (b) the actions of you, us or third parties or (c) the validity of this arbitration provision (individually and collectively, a "Claim") must, after an election by you or us, be resolved by binding arbitration in accordance with this arbitration provision and the Consumer Arbitration Rules of the American Arbitration Association ("AAA") in effect when the Claim is filed (or, in the event this arbitrator or these arbitration rules are no longer available, then a comparable substitute arbitration procedure and/or arbitration organization that does business on a nationwide basis). There shall be no authority for any Claims to be arbitrated on a class action basis. An arbitration can only decide our or your Claim and may not consolidate or join the claims of other persons who may have similar claims. You may obtain rules and forms by contacting the AAA at 800-778-7879 or www.adr.org/Rules. Any arbitration hearing that you attend will take place in the federal judicial district where you reside. At your request, we will advance the first $200 of the filing and hearing fees for any Claim you may file against us; the arbitrator will decide whether we or you will ultimately pay those fees. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. This arbitration provision shall survive repayment of your extension of credit and termination of your account. This arbitration provision shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* If any provision of this Section is ruled invalid or unenforceable, this Section shall be rendered null and void in its entirety.**

**30. ELECTRONIC SIGNATURES AND CONVERSION**

If signed electronically, the authoritative copy of this Lease will be held in a designated document management system, but we may convert it into a paper copy marked "Original" onto which your electronic signature is affixed. If we do, the affixed signature will be your legally valid and binding signature and the paper copy alone will be the original of this Lease.

**31. SIGNATURES**

YOU AGREE TO ALL THE PROVISIONS ON **ALL SIX PAGES OF THIS LEASE** AND REPRESENT THAT YOU HAVE READ **ALL SIX PAGES OF THIS LEASE.**

<b>THERE IS NO COOLING OFF PERIOD</b>

**California law does not provide for a "cooling off" or other cancellation period for vehicle leases. Therefore, you cannot later cancel this Lease simply because you change your mind, decided the Vehicle costs too much, or wish you had acquired a different vehicle. You may cancel this Lease only with the agreement of the Lessor or for legal cause, such as fraud.**

**You have the right to return the Vehicle, and receive a refund of any payments made if the credit application is not approved, unless nonapproval results from an incomplete application or from incorrect information provided by you.**

**Notice to Lessee and Co-Lessee: (1) Do not sign this Lease before you read it or if it contains any blank spaces to be filled in; (2) You are entitled to a completely filled in copy of this Lease; (3) Warning – Unless a charge is included in this Lease for public liability or property damage insurance, payment for that coverage is not provided by this Lease.**

<b>YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS LEASE.</b>

INDIVIDUAL LESSEE SIGNATURE(S)

| Lessee Signature: | Co-Lessee Signature: |
|---|---|
| X | X  N/A |

BUSINESS LESSEE SIGNATURE

| Authorized Signer's Name: | Title: | Signature: |
|---|---|---|
| N/A | N/A | X  N/A |

LESSOR SIGNATURE

The authorized signature of the Lessor below has the effect of: (1) accepting the terms and conditions of this Lease; (2) acknowledging verification of the Lessee's insurance coverage (see Section 16); and (3) assigning to USB Leasing LT or its successors and assigns all right, title and interest in, and to the Vehicle and this Lease according to the terms and conditions of the Lease Finance Agreement between Lessor and Assignee.

Authorized Signature: X

# EXHIBIT B

# MOTOR VEHICLE LEASE AGREEMENT – CLOSED-END – CALIFORNIA



**1.  LESSEE AND LESSOR**

**LESSEE AND CO-LESSEE**
Name: JOSEPH  MIZRAHI
Address: ▨▨▨▨▨▨▨

County: LOS ANGELES

**LESSOR**
Name: VINFAST AUTO LLC
Address:
790 N SAN MATEO
SAN MATEO CA 94401

**VEHICLE GARAGING ADDRESS** (if different from Lessee/Co-Lessee address):
N/A

**LEASE NUMBER**  N/A                      **LEASE DATE** 08/18/2024

The words "you" and "your" mean each person named as a Lessee or Co-Lessee above. The words "we", "us" and "our" mean the Lessor named above and USB Leasing LT or its successors and assigns ("Assignee"), to whom this Motor Vehicle Lease Agreement ("Lease") will be assigned. "Vehicle" means the leased vehicle described below, including all equipment, parts, accessories and accessions. You agree to lease the Vehicle from us according to the terms and conditions of this Lease. The consumer lease disclosures contained in this Lease are also made on behalf of Assignee.

**2.  VEHICLE DESCRIPTIONS**
A.  LEASED VEHICLE

| | Year | Make | Model | Body Style | Odometer Reading | Vehicle Identification Number |
|---|---|---|---|---|---|---|
| ☐ New | | | | | | |
| ☐ Used | 2024 | VINFAST | VF 8 | PLUS AWD 87.7 KWH | 50 | RLLV1AFA0RH007415 |

Primary Use of Vehicle:
**The primary use of the Vehicle is for personal, family, or household purposes.**

You acknowledge that you have received and examined the Vehicle described above, that the Vehicle is equipped as described and is in good operating order and condition. You accept the Vehicle for all purposes of this Lease.

B.   TRADE-IN VEHICLE: Year  N/A          Make N/A                        Model  N/A

Gross Allowance $  N/A                    Amount Owed $  N/A              Net Trade-in Allowance $ 0.00

C.   FOR USE BY LESSOR: Trade-in, turn-in, and other individualized agreements:

N/A

**7. *ITEMIZATION OF AMOUNT DUE AT LEASE SIGNING OR DELIVERY**

| **3.  AMOUNT DUE AT LEASE SIGNING OR DELIVERY** (Itemized below)* | **4.  MONTHLY PAYMENTS** | **5.  OTHER CHARGES** (Not part of your Monthly Payment) | **6.  TOTAL OF PAYMENTS** (The amount you will have paid by the end of the Lease) |
|---|---|---|---|
| $ 10,062.00 | A.  Your first Monthly Payment of $ 361.81 is due on the Lease Date, followed by 35 payments of $ 361.81 due on the 18TH of each month. <br> B.  The total of your Monthly Payments is $ 13,025.16. | A.  Termination Fee (if you do not purchase the Vehicle) $ 395.00 <br><br> B.  Total $ 395.00 | $ 23,120.35 <br><br> (Sections 3 **plus** 4(B) **plus** 5(B) **minus** Sections 7(A)(3) **minus** 7(A)(4)) |

**A.  Amount Due at Lease Signing or Delivery:**

| | | |
|---|---|---|
| (1) | Capitalized Cost Reduction | $ 7,501.44 |
| (2) | Sales/Use Tax on Capitalized Cost Reduction | 712.64 |
| (3) | First Monthly Payment | 361.81 |
| (4) | Refundable Security Deposit | N/A |
| (5) | Title Fees | N/A |
| (6) | Registration Fees | 98.00 |
| (7) | Upfront Sales/Use Tax on Vehicle | N/A |
| (8) | California Tire Fee (paid to State) | 7.00 |
| (9) | Electronic Vehicle Registration or Transfer Charge (Not a governmental fee) | 33.00 |
| (10) | Document Processing Charge (Not a governmental fee) | 85.00 |
| (11) | Acquisition Fee | 695.00 |
| (12) | LICENSE-280.00/SMOG ABATE-20.00 | 300.00 |
| (13) | OTHER TA-74.11/TRANSPOR-194.00 | 268.11 |
| (14) | Total | $ 10,062.00 |

**B.  How the Amount Due at Lease Signing or Delivery will be Paid:**

| | | |
|---|---|---|
| (1) | Net Trade-in Allowance | $ 0.00 |
| (2) | Rebates and Noncash Credits | 7,500.00 |
| (3) | Amount to be Paid in Cash | 2,562.00 |
| (4) | Total | $ 10,062.00 |

(Continued on Page 2)

**(Continued from Page 1)**

### 8. YOUR MONTHLY PAYMENT IS DETERMINED AS SHOWN BELOW:

| | | |
|---|---|---|
| A. | **Gross Capitalized Cost.** The agreed upon value of the Vehicle ($ 43,100.00 ) and any items you pay over the Lease Term (such as taxes, fees, service contracts, insurance, and any outstanding prior credit or lease balance) . . . . . . . . . . . . . . . | $ 43,225.00 |
| B. | **Capitalized Cost Reduction.** The amount of any Net Trade-in Allowance, rebate, noncash credit, or cash you pay that reduces the Gross Capitalized Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | − 7,501.44 |
| C. | **Adjusted Capitalized Cost.** The amount used in calculating your Base Monthly Payment . . . . . . . . . . . . . . . . . . . . . . . . . | = 35,723.56 |
| D. | **Residual Value.** The value of the Vehicle at the end of the Lease used in calculating your Monthly Payment . . . . . . . . . | − 23,850.00 |
| E. | **Depreciation and any Amortized Amounts.** The amount charged for the Vehicle's decline in value through normal use and for other items paid over the Lease Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | = 11,873.56 |
| F. | **Rent Charge.** The amount charged in addition to the Depreciation and any Amortized Amounts . . . . . . . . . . . . . . . . . . . . . . | + 21.56 |
| G. | **Total of Base Monthly Payments.** The Depreciation and any Amortized Amounts plus the Rent Charge . . . . . . . . . . . . . . | = 11,895.12 |
| H. | **Lease Payments.** The number of payments in your Lease (Lease Term ___36___ months) . . . . . . . . . . . . . . . . . . . . | ÷ 36 |
| I. | **Base Monthly Payment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | = 330.42 |
| J. | **Monthly Sales/Use Tax** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | + 31.39 |
| K. | **N/A** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | + N/A |
| L. | **Total Monthly Payment** ("Monthly Payment") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | = $ 361.81 |

> **Early Termination.** You may have to pay a substantial charge if you end this Lease early. <u>The charge may be up to several thousand dollars.</u> The actual charge will depend on when the Lease is terminated. The earlier you end the Lease, the greater this charge is likely to be.

### 9. EXCESSIVE WEAR AND USE

You may be charged for excessive wear based on our standards for normal use and for mileage in excess of 10,000 miles per year at the rate of $ 0.25 per mile. No rebate or credit will be paid to you if the mileage is less than the specified amounts.

### 10. PURCHASE OPTION AT END OF LEASE TERM

If you have fully performed all of your obligations under this Lease, including paying the total of your Monthly Payments and all other amounts due under this Lease, then you (the Lessee or Co-Lessee only) have an option to purchase the Vehicle AS IS at the end of the Lease Term for $ 24,200.00 *, plus any taxes, official fees and other charges related to such purchase. *Includes a purchase option fee of $350.

**Other Important Terms.** See all six pages of this Lease for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interest, if applicable.

### 11. ITEMIZATION OF GROSS CAPITALIZED COST

| | | |
|---|---|---|
| A. | Agreed Upon Value of Vehicle as Equipped at Lease signing | $ 43,100.00 |
| B. | Sales/Use Tax | N/A |
| C. | Initial Title, Registration, and License Fees | N/A |
| D. | Outstanding Prior Credit or Lease Balance | N/A |
| E. | Acquisition Fee | N/A |
| F. | Document Processing Charge (Not a governmental fee) | N/A |
| G. | Mechanical Breakdown Protection Contract | N/A |
| H. | Credit Insurance | |
| | 1. Single Credit Life  N/A | |
| | 2. Joint Credit Life  N/A | |
| | 3. Joint Credit Disability  N/A | |
| I. | Total Credit Insurance (H 1+2+3) | N/A |
| J. | Maintenance Contract  N/A | |
| K. | Service Contract (describe) N/A  N/A | |
| L. | Total Service Contracts (J+K) | N/A |
| M. | Extended Warranty Contract (non-insurance product) | N/A |
| N. | Accessories/Optional Equipment (to be added after lease signing): | |
| | 1. FLOOR MATS | 125.00 |
| | 2. N/A | N/A |
| | 3. N/A | N/A |
| | 4. N/A | N/A |
| | 5. N/A | N/A |
| | 6. N/A | N/A |
| O. | California Tire Fees | N/A |
| P. | Electronic Vehicle Registration or Transfer Charge (Not a governmental fee) | N/A |
| Q. | Other (describe) N/A | N/A |
| R. | Other (describe) N/A | N/A |
| S. | Other (describe) N/A | N/A |
| T. | Other (describe) N/A | N/A |
| U. | **Total = Gross Capitalized Cost** | $ 43,225.00 |

### 12. ESTIMATED OFFICIAL FEES AND TAXES

The total estimated amount you will pay for official and license fees, registration, title and taxes over the term of your Lease, whether included with your Monthly Payments or assessed otherwise: $ 3,050.79 . This is an estimate based on current tax rates, the actual total of fees and taxes may be higher or lower, depending on the tax rate in effect or the value of the Vehicle at the time a fee or tax is assessed.

**13. WARRANTIES AND OPTIONAL PRODUCTS**

If the Vehicle is new, it is covered by the standard manufacturer's new vehicle warranty. If the Vehicle is new or used, it is not covered by any other express warranty unless identified below:

☒ The Vehicle is covered by the remainder of the standard manufacturer's new vehicle warranty.

☐ The Vehicle is covered by an extended warranty purchased from the manufacturer or other third party provider.

☐ N/A _____.

We assign to you all rights we have under any of these warranties. You acknowledge that you have received a copy of the indicated warranties.

**You expressly agree and understand that you have selected and agreed to lease the Vehicle "AS IS." WE MAKE NO WARRANTIES OR REPRESENTATIONS, EITHER EXPRESS OR IMPLIED AS TO THE VEHICLE OR ANY PART OR ACCESSORY THEREOF. WE MAKE NO WARRANTY OF MERCHANTABILITY OR FITNESS OF THE VEHICLE FOR ANY PARTICULAR PURPOSE OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER.**

---

**You are not required to buy any of the optional insurance or other products listed below to enter into the Lease and your decision not to do so will not be a factor in the approval of this extension of credit.** These insurance and other products will not be provided unless you sign below and are accepted by the Provider. If you sign below, you acknowledge receipt of a notice of the terms of the insurance or product, you want to obtain the insurance or product checked, and you agree to pay the premium or charge shown.

☐ **Credit Life Insurance**
  ☐ Credit Life
  Initial Coverage: $ N/A _____  ☐ Single  Cost: $ N/A _____
                                    ☐ Joint   Cost: $ N/A _____
  ☐ Credit Disability
  Maximum Monthly
  Coverage: $ N/A _____  ☐ Joint  Cost: $ N/A _____

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Lessee is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR A CHIROPRACTOR IN THE LAST SIX MONTHS. (Refer to "Total Disabilities Not Covered" in your policy for details.)

| N/A | X N/A | N/A |
|---|---|---|
| Date | Primary Lessee Signature | Age |
| N/A | X N/A | N/A |
| Date | Co-Lessee Signature | Age |

☐ **Mechanical Breakdown Protection Contract**

| N/A | $ N/A | N/A  N/A |
|---|---|---|
| Provider | Cost | mo./mileage |
| X N/A | X N/A | |
| Lessee Signature | Co-Lessee Signature | |

☐ **Maintenance or Service Contract**

| N/A | $ N/A | N/A  N/A |
|---|---|---|
| Provider | Cost | mo./mileage |
| X N/A | X N/A | |
| Lessee Signature | Co-Lessee Signature | |

☐ **Extended Warranty Contract** (non-insurance product)

| N/A | $ N/A | N/A |
|---|---|---|
| Provider | Cost | mo./mileage |
| X N/A | X N/A | |
| Lessee Signature | Co-Lessee Signature | |

---

**14. INSURANCE VERIFICATION**

The Vehicle is insured by:

| Policy Number | Insurance Company | Insurance Agent | Agent Address | Agent Phone Number |
|---|---|---|---|---|
| 604 5286-E30-75F | STATE FARM MUTUAL AUTO | GOLDIE KRAUS | PO BOX 2358, BLM, IL 61702 | (310) 278-4814 |

You authorize us to verify and give your agent authorization to place the minimum coverage required by this Lease (see Section 16).

**15. LATE CHARGE; RETURNED PAYMENT CHARGE**

If all or any portion of a Monthly Payment or any other amount due under this Lease is not received within 10 days after it is due, you will pay a late charge of $25.

If any payment is returned to us unpaid for any reason, including, but not limited to, non-sufficient funds, you will pay a returned payment charge of $20, to the extent not prohibited by applicable law.

**16. INSURANCE**

Unless otherwise agreed, you must provide insurance coverage in the amount and types indicated below at your expense during the Lease Term and until the Vehicle is returned to us:

A. Fire, theft and comprehensive insurance with a maximum deductible of $500;

B. Collision insurance with a maximum deductible of $500;

C. Liability insurance for bodily injury or death to any one person in the amount of $100,000 and for any one accident in the amount of $300,000 or combined single limit coverage of $300,000;

D. Property damage insurance for $50,000; and

E. Uninsured and underinsured motorist coverage and any other insurance required by the state where the Vehicle is registered.

The insurance policy must name us as loss payee and an additional insured. The policy also must require the insurance company to notify us 10 days before any cancellation or changes in insurance coverage. You will notify us and your insurance company within 24 hours after any damage, loss, theft, seizure or impoundment of the Vehicle. You assign to us any amounts payable under such insurance policies. You agree that we may endorse your name upon any check, draft, order or other similar instrument representing payment to you of such amounts.

**The insurance listed above is required in connection with this Lease. You have the option of providing the required insurance through an existing policy of insurance owned or controlled by you or through a policy paid for by you and obtained from any insurance company authorized to transact business in the state in which this Lease was signed. We may for reasonable cause decline the insurance provided by you.**

**PHYSICAL DAMAGE OR LIABILITY INSURANCE COVERAGE FOR BODILY INJURY OR PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED IN THIS LEASE.**

**17. VEHICLE OPERATION**

A. VEHICLE MAINTENANCE AND OPERATING COSTS. You agree to maintain the Vehicle in good working order and operating condition and have all necessary repairs made. You are responsible for all costs of maintaining and servicing the Vehicle. You agree to have the Vehicle serviced and repaired according to the manufacturer's recommendations and to ensure that the warranty, if any, remains valid. If applicable, you will charge and maintain the electric vehicle battery according to manufacturer and warranty requirements. You will keep all maintenance and repair records. You agree to comply with all manufacturer recall notices. You agree to pay for all operating costs including, but not limited to as applicable, gas, oil, antifreeze, electric vehicle battery charging and maintenance, traffic and parking tickets or violations, towing and replacement tires.

B. VEHICLE USE. You will: (1) allow the Vehicle to be operated only by licensed and insured drivers; (2) not use the Vehicle for any improper or illegal purpose, or to commit any illegal act; (3) not use the Vehicle to transport passengers or goods for hire, including but not limited to use as taxi cab, limousine, ride service, delivery service, for livery, as a municipal vehicle, ambulance, hearse, or in driver education; (4) not use the Vehicle in any way

that causes the cancellation or suspension of any applicable insurance or manufacturer's warranty; (5) not use the Vehicle in towing, snow plowing, construction, or for hauling; (6) not remove the Vehicle from the state where you reside for more than 30 consecutive days without our prior written approval (for purposes of this Section 17(B)(6), the state where you reside is the state where the Vehicle was originally titled on the Lease Date or, if applicable, the most recent state where we permitted you to title the Vehicle); (7) not remove the Vehicle from the contiguous United States for any period of time; (8) not change or modify the Vehicle in any way without our prior written approval, except for normal maintenance; and (9) deliver the Vehicle to such location that we require for our inspection at any time during the Lease Term. **You will not assign or sublease any interest in the Vehicle or the Lease without our written consent.**

C.   TAXES, REGISTRATION AND TITLING. You agree to pay all title, registration, license, inspection, testing, and other fees, taxes and charges imposed by government authorities in connection with the Vehicle, this Lease or any amounts due or payable arising from this Lease. If such amounts are assessed for a period during the Lease Term, you will pay them even if they become due after the Lease Term.

You agree to title, register and license the Vehicle in the state in which it is garaged. You must request any power of attorney required from us to title, register or license the Vehicle. You agree to pay a $25 title transfer fee each time the Vehicle is retitled.

**If the Vehicle is registered in a jurisdiction which assesses personal property taxes, you agree to pay the personal property tax.**

D.   RELEASE OF INFORMATION. You agree that we may provide information about you to government authorities upon their request for the purpose of enforcing any fees, charges, penalties, etc. related to your use or ownership of the Vehicle.

**18.   PURCHASE OPTION**

A.   END OF LEASE TERM. At scheduled Lease termination, you have an option to purchase the Vehicle AS IS as set forth in Section 10 of this Lease.

B.   PRIOR TO END OF LEASE TERM. At any time prior to scheduled Lease termination, you have an option to purchase the Vehicle AS IS. The Purchase Option Price will be a sum equal to: (1) the amount set forth in Section 10; **plus** (2) the Early Termination Liability set forth in Section 22(C), excluding the items set forth in Sections 22(C)(1), (C)(4), (C)(6) and (C)(7).

C.   TRUE LEASE. This is a true lease and you will not own or have any equity in the Vehicle or its replacement parts unless you exercise the option to purchase the Vehicle.

**19.   EXCESS WEAR AND USE**

We have based the Monthly Payment on the assumption that you will not subject the Vehicle to excess wear and use. You agree not to expose the Vehicle to excess wear and use. If you do so and if you do not purchase the Vehicle at the scheduled end of the Lease Term, you agree to pay us the amount that it would cost to make all repairs to the Vehicle that are not the result of normal wear whether or not we, in our sole discretion, actually make the repairs. Any excess wear and use assessed at scheduled termination of this Lease will be based upon an estimate of the repair cost unless we actually make the repairs.

Excess wear and use includes, but is not limited to, the amount it would cost to repair: (1) inoperative mechanical parts, including power accessories; (2) dented, scratched, chipped or rusted areas on the body; (3) mismatched paint or any special identification mark; (4) cracked, scratched, pitted or chipped windows, broken or discolored windows or inoperative window mechanisms; (5) broken headlight lenses or sealed beams; (6) scratches more than two inches long through the chrome on bumpers or bumper dents; (7) broken grilles or dents in the grilles; (8) single dents or a series of dents on other trim parts, including headlight and tail light bezels; (9) electronic malfunctions; (10) seats, seat belts, headlining, dashboards, door panels or carpeting which is torn or damaged beyond ordinary wear and tear or is burned; (11) major fluid leaks; (12) damaged exhaust systems; (13) damage from flood, water, hail or sand; (14) damage which makes the Vehicle either unsafe or unlawful to operate; (15) all damage which would be covered by the required comprehensive, collision and upset insurance whether or not such insurance actually is in force; and (16) the Vehicle to restore any original equipment or accessories which were removed or altered during the Lease Term.

Excess wear and use also includes, but is not limited to, the amount it would cost to replace: (i) any tire not part of a matching set of five tires (or four with emergency "doughnut" spare if initially so equipped); (ii) any tires with less than 1/8 inch of tread remaining at the shallowest point; (iii) any tire with gouged, cut, torn or plugged sidewalls; (iv) any missing or dented parts, accessories and adornments, including bumpers, jacks, ornamentation, aerials,

hubcaps, chrome stripping, rear view mirrors, radio and stereo components or spare tire; or (v) any parts which are not original manufacturer equipment or of equal quality and design.

**Only an inspection company designated by us is authorized to conduct an inspection to determine excess wear and use.**

**20.   VEHICLE RETURN**

If you do not exercise your Purchase Option, you must return the Vehicle to us at the time and place we specify. If you fail to return the Vehicle, you must continue to make your Monthly Payment to us on a month-to-month basis as approved by us, but in no circumstance can the Lease Term continue for more than 6 months beyond the scheduled Lease termination date. **Unless this Lease ends under another section of this Lease, if you fail to return the Vehicle within 72 hours after expiration of the scheduled Lease Term, we may report the Vehicle as stolen.** You must provide a method for us to contact you if the Vehicle is not returned on time. We will use the contact information you provided when you applied for the Lease. If the information provided changes during the Lease Term, you agree to notify us with updated contact information.

**21.   SCHEDULED TERMINATION**

Except for Early Termination, this Lease will terminate or end upon:

A.   The end of the Lease Term;

B.   Return of the Vehicle;

C.   Completion of a signed odometer statement; and

D.   Payment of the following amounts:
   (1)   The Termination Fee;
   (2)   Any amounts owed for Excess Wear;
   (3)   Any amounts owed for Excess Mileage;
   (4)   All amounts due and unpaid under this Lease; and
   (5)   Any official fees and taxes due in connection with Lease termination.

**22.   EARLY TERMINATION**

A.   LESSEE'S RIGHT TO TERMINATE EARLY. You may terminate this Lease before the end of the Lease Term. If you do not exercise your purchase option, the charge for such Early Termination is the Early Termination Liability defined below. You must send us written notice of your early termination by registered mail 30 days before the date of termination.

B.   LESSOR'S RIGHT TO TERMINATE EARLY. We may terminate this Lease before the end of the Lease Term if you are in Default. If you do not exercise your purchase option, upon such termination we shall be entitled to the Early Termination Liability defined below.

C.   EARLY TERMINATION LIABILITY. The Early Termination Liability is calculated as follows:
   (1)   The Termination Fee; **plus**
   (2)   All unpaid amounts that are due or past due under this Lease; **plus**
   (3)   Any official fees, taxes and other charges related to early termination; **plus**
   (4)   All expenses related to recovering, obtaining, storing, preparing for sale and selling the Vehicle, including reasonable attorneys' fees to the extent not prohibited by law; **plus**
   (5)   The Lease Balance; **plus**
   (6)   The Residual Value of the Vehicle; **minus**
   (7)   The Realized Value of the Vehicle.

D.   LEASE BALANCE. The Lease Balance is equal to:
   (1)   The Base Monthly Payment times the number of Monthly Payments not yet due; **minus**
   (2)   Unearned Rent Charges included in the Base Monthly Payments not yet due calculated according to the Actuarial Method.

The term "Actuarial Method" means the method of allocating Base Monthly Payments between: (i) the reduction of the Adjusted Capitalized Cost to the Residual Value over the Lease Term; and (ii) Rent Charges. Under this method, a Base Monthly Payment is applied first to the accumulated Rent Charges and any remainder is subtracted from, or any deficiency is added to, the balance of the Adjusted Capitalized Cost.

E.   REALIZED VALUE. The Realized Value will be determined in one of the following ways:
   (1)   By a written agreement between you and us;
   (2)   Within 10 days of early termination, you may obtain, at your own expense, from an independent third party agreeable to both you and us, a professional appraisal of the wholesale value of the Vehicle which could be realized at sale. The appraised value shall then be used as the Realized Value.
   (3)   We determine the Realized Value in accordance with accepted practices in the automobile industry for determining the wholesale value of used vehicles by obtaining a wholesale cash bid for the purchase of the Vehicle or by disposing of the Vehicle in an otherwise commercially reasonable manner.

(4)  If the Vehicle is subject to a total loss due to collision, destruction or unknown theft as determined by us, the Realized Value will equal the amount of any proceeds we receive from your required insurance. If there are no insurance proceeds, the Realized Value will be zero.

F.  If you terminate this Lease early pursuant to the federal Servicemembers Civil Relief Act or any equivalent provisions under state law, you may be charged for excess mileage if the actual mileage of the Vehicle at Lease termination is more than the allowed miles for the time period that you actually leased the Vehicle. In this case, we will calculate the total allowed miles by prorating the annual allowed miles set out in Section 9 to the month. If you terminate this Lease early for any other reason and your Early Termination Liability includes payment to us of the remaining Base Monthly Payments, you may be charged for excess mileage only if the actual mileage of the Vehicle at Lease termination is more than the total allowed mileage for the entire Lease Term.

## 23.  DEFAULT

A.  DEFAULT. The following are events of default ("Default") to the extent permitted by state law:

(1)  You fail to make any payment in full when due;
(2)  You fail to keep any promise in this Lease or any agreement made in connection with this Lease;
(3)  You fail to maintain insurance on the Vehicle as required by this Lease;
(4)  You fail to return the Vehicle to us at the time and place we specify;
(5)  You die, are declared incompetent, become insolvent, or a bankruptcy petition is filed by or against you or you dissolve or cease active business affairs;
(6)  You make any material misrepresentation on your credit application;
(7)  The Vehicle is subject to actual or threatened seizure, confiscation or levy by governmental or legal process;
(8)  Your driver's license expires or is suspended, revoked, cancelled or is otherwise restricted;
(9)  The Vehicle is subject to a total loss due to collision, destruction, or unknown theft; or
(10) Anything else happens that adversely affects our interest in the Vehicle or your ability to comply with your obligations under this Lease.

B.  REMEDIES. If this Lease is in Default, we may take any one or more of the following actions:

(1)  Terminate this Lease and your rights to use the Vehicle.
(2)  Take possession of the Vehicle without prior demand, unless otherwise required by law. If the Vehicle is equipped with an electronic tracking device, you understand and agree that we may use the device to find the Vehicle and exercise our right to take possession. We may take any personal property that is in or on the Vehicle when we take it. We will hold the personal property for you for ten (10) days, but we will neither be responsible for safekeeping such property nor are we required to notify you about it. If you do not pick up the property within that time, we may dispose of it any way we determine.
(3)  Recover all expenses related to enforcing this Lease and obtaining, storing and selling the Vehicle, including, without limitation, reasonable attorneys' fees and court costs, to the extent not prohibited by law.
(4)  Take any reasonable action to correct the default or to prevent our loss. You agree to reimburse us for any amounts we pay to correct or cover your Default.
(5)  Require you to return the Vehicle and any related records or make them available to us in a reasonable manner.
(6)  Make a claim for any and all insurance, warranty, mechanical breakdown protection or maintenance contract benefits or refunds that may be available on your Default or on the termination of the Lease and apply any amount received to the amount you owe.
(7)  Assess interest on all outstanding amounts owing to us under this Lease, including without limitation, amounts owing for excess wear and use and for excess mileage, at the highest rate permitted by applicable law until such amounts are paid in full.
(8)  Use any remedy we have at law or in equity.

## 24.  REIMBURSEMENT

You will reimburse us for and hold us harmless from any loss or damage to the Vehicle and its contents and from all claims, costs and injuries, expenses and costs related to the use, maintenance or condition of the Vehicle or its driver. If you fail to pay, you will reimburse us and pay a $25 administration fee, where permitted by law, for any fine, ticket, penalty or other amount that is paid on your behalf.

## 25.  WAIVER OF GAP AMOUNT; TOTAL LOSS OF VEHICLE.

If the Vehicle is subject to a total loss due to collision, destruction or unknown theft as determined by us, you will pay to us the Gap Amount, which is the difference between the Early Termination Liability set forth in Section 22(C) and the insurance proceeds received by us on account of the total loss of the Vehicle. However, if you had in effect the vehicle insurance required under this Lease at the time of the total loss, we will waive the Gap Amount and you will pay to us the sum of: (A) all Monthly Payments overdue and any other amounts that are due or past due at the time of the loss; **plus** (B) the amount of your insurance deductible and any other amounts that were subtracted from the Vehicle's actual cash value to determine the insurance proceeds we received for the total loss; **plus** (C) any rebates of charges for warranties, mechanical breakdown protection or maintenance contracts purchased in connection with this Lease. Even if the Vehicle is insured, you must continue to pay your scheduled Monthly Payments until we receive your full insurance proceeds.

## 26.  REFUNDABLE SECURITY DEPOSIT

Your Refundable Security Deposit may be used by us to pay all amounts that you fail to pay under this Lease. Upon termination of this Lease and our determination that no additional amounts may be due after Lease termination (such as personal property taxes not yet billed), we will refund to you any portion of the Refundable Security Deposit not applied to amounts you owe and fail to pay under this Lease. Your Refundable Security Deposit cannot be used as a Monthly Payment. You will not earn interest on your Refundable Security Deposit. Any interest or monetary benefit to us which may accrue as a result of our retention of the Refundable Security Deposit will neither be paid to you nor applied to reduce your obligations under this Lease.

## 27.  LESSOR'S RIGHT TO CANCEL

**If we are unable to assign this Lease to a financial institution within 10 business days, we have the right to cancel the Lease. You will be required to return the Vehicle to us. If the Vehicle has experienced more than normal wear and tear, you will be responsible for all costs we incur to restore the Vehicle to the same condition in which you received it. We will return to you all amounts received from you at lease closing less the amount required to restore the Vehicle's condition.**

## 28.  GENERAL

A.  SECURITY INTEREST. You grant us a security interest, to the extent permitted by state law, in the property listed below to secure performance of your obligations under this Lease: (1) in loss proceeds of any Vehicle insurance; (2) in the proceeds of any credit life or disability insurance, mechanical breakdown protection or maintenance contract purchased with this Lease; and (3) any unearned premiums or refunds of any of the foregoing.

B.  ODOMETER STATEMENT/OTHER DOCUMENTS. Federal Law requires that you disclose the Vehicle's odometer reading to us upon termination of this Lease or transfer of ownership. Failure to complete an odometer disclosure statement, failure to return it to us or making a false statement therein may result in fines and/ or imprisonment. You will be provided an odometer disclosure statement to complete prior to the termination of the Lease. You also agree to execute any and all documents and/or provide us with any information that we may reasonably request from you in connection with the termination of this Lease or transfer of ownership.

C.  OWNERSHIP. This agreement is a lease only. We are the owner of the Vehicle. You have no rights of ownership or title to the Vehicle unless you exercise your purchase option. You will not allow any lien or encumbrance to attach to the Vehicle.

D.  RIGHT OF SET-OFF. We may apply any money in any deposit account you have with us and on which your name appears as owner or co-owner, or any credit balance in your lease account to the payment of amounts you owe to us including lease termination charges as detailed in this Lease.

E.  ENFORCEABILITY. This Lease will be governed and enforced by the laws of California. Each Lessee is responsible, individually and together, under this Lease. This is known as "joint and several" responsibility. If any provision of this Lease is found unenforceable by any court, the remaining provisions of the Lease will remain in full force and effect.

F.  WARRANTY OF AMOUNT OWED. You promise that the Amount Owed on any trade-in vehicle is accurate. If the Amount Owed is more than the amount shown in the Description of Trade-In Vehicle on the front of this Lease, you will pay Lessor the excess amount upon demand.

G.  **EXPRESS CONSENT TO CONTACT YOU. By providing us with a telephone number for a cellular phone or other wireless device, including a number that you later convert to a cellular number, you are expressly consenting to receiving communications – including but not limited to prerecorded or artificial voice message calls, text messages, and calls made by an automatic telephone**

dialing system – from U.S. Bank and our affiliates and agents at that number. This express consent applies to each such telephone number that you provide to us now or in the future and permits such calls for non-marketing purposes. Calls and messages may incur access fees from your cellular provider.

H.  **ENTIRE AGREEMENT.** Important: Read before signing. The terms of this Lease should be read carefully because with

those terms in writing are enforceable. No other terms or oral promises not contained in this Lease may be legally enforced. The terms of this Lease may only be changed by a written agreement signed by you and us. This Lease is a final expression of the credit agreement between you and us. This Lease may not be contradicted by evidence of any prior oral credit agreement or of a contemporaneous oral credit agreement between you and us.

**29. ARBITRATION.** This Section does not apply to any dispute in which the amount in controversy is within the jurisdiction limits of, and is filed in, a small claims court, and you and we retain rights to self-help remedies, such as repossession. You agree that if a dispute of any kind arises out of this agreement, either you or we can choose to have that dispute resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or to have a jury trial on that claim, or to engage in pre- arbitration discovery, except as provided for in the arbitration rules specified in this provision. In addition, you will not have the right to participate as a representative or member of any class of claimants pertaining to any claim subject to arbitration. The arbitrator's decision will generally be final and binding. Other rights that you would have if you went to court may also not be available in arbitration. It is important that you read this entire arbitration provision carefully before accepting the terms of this agreement.

Any claim, dispute or controversy (whether in contract, tort, or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to (a) the credit or services offered or provided to you, (b) the actions of you, us or third parties or (c) the validity of this arbitration provision (individually and collectively, a "Claim") must, after an election by you or us, be resolved by binding arbitration in accordance with this arbitration provision and the Consumer Arbitration Rules of the American Arbitration Association ("AAA") in effect when the Claim is filed (or, in the event this arbitrator or these arbitration rules are no longer available, then a comparable substitute arbitration procedure and/or arbitration organization that does business on a nationwide basis). There shall be no authority for any Claims to be arbitrated on a class action basis. An arbitration can only decide our or your Claim and may not consolidate or join the claims of other persons who may have similar claims. You may obtain rules and forms by contacting the AAA at 800-778-7879 or www.adr.org/Rules. Any arbitration hearing that you attend will take place in the federal judicial district where you reside. At your request, we will advance the first $200 of the filing and hearing fees for any Claim you may file against us; the arbitrator will decide whether we or you will ultimately pay those fees. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. This arbitration provision shall survive repayment of your extension of credit and termination of your account. This arbitration provision shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* If any provision of this Section is ruled invalid or unenforceable, this Section shall be rendered null and void in its entirety.

**30.  ELECTRONIC SIGNATURES AND CONVERSION**

If signed electronically, the authoritative copy of this Lease will be held in a designated document management system, but we may convert it into a paper copy marked "Original" onto which your electronic signature is affixed. If we do, the affixed signature will be your legally valid and binding signature and the paper copy alone will be the original of this Lease.

**31.  SIGNATURES**

YOU AGREE TO ALL THE PROVISIONS ON **ALL SIX PAGES OF THIS LEASE** AND REPRESENT THAT YOU HAVE READ **ALL SIX PAGES OF THIS LEASE.**

### THERE IS NO COOLING OFF PERIOD

California law does not provide for a "cooling off" or other cancellation period for vehicle leases. Therefore, you cannot later cancel this Lease simply because you change your mind, decided the Vehicle costs too much, or wish you had acquired a different vehicle. You may cancel this Lease only with the agreement of the Lessor or for legal cause, such as fraud.

You have the right to return the Vehicle, and receive a refund of any payments made if the credit application is not approved, unless nonapproval results from an incomplete application or from incorrect information provided by you.

Notice to Lessee and Co-Lessee: (1) Do not sign this Lease before you read it or if it contains any blank spaces to be filled in; (2) You are entitled to a completely filled in copy of this Lease; (3) Warning – Unless a charge is included in this Lease for public liability or property damage insurance, payment for that coverage is not provided by this Lease.

### YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS LEASE.

| INDIVIDUAL LESSEE SIGNATURE(S) | |
|---|---|
| Lessee Signature:<br>X *[signature]* | Co-Lessee Signature:<br>X N/A |

| BUSINESS LESSEE SIGNATURE | | |
|---|---|---|
| Authorized Signer's Name:<br>N/A | Title:<br>N/A | Signature:<br>X N/A |

**LESSOR SIGNATURE**

The authorized signature of the Lessor below has the effect of: (1) accepting the terms and conditions of this Lease; (2) acknowledging verification of the Lessee's insurance coverage (see Section 16); and (3) assigning to USB Leasing LT or its successors and assigns all right, title and interest in, and to the Vehicle and this Lease according to the terms and conditions of the Lease Finance Agreement between Lessor and Assignee.

Authorized Signature: X *[signature]*